UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2011 FEB -4 PM 3: 14

BY _____
DEPUTY CLERK

JEREMIAH BINDRUM, )
)
    Plaintiff, )
)
v. ) Case No. 5:10-cv-116
)
AMERICAN HOME ASSURANCE COMPANY, INC., )
AMERICAN INTERNATIONAL GROUP, INC., )
AIG SPECIALITY CLAIMS SERVICES, INC., )
CHARTIS INSURANCE COMPANY, )
)
    Defendants. )

## OPINION AND ORDER DISMISSING WITHOUT PREJUDICE COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION AND DENYING DEFENDANTS' MOTION TO DISMISS AS MOOT

Plaintiff, Jeremiah Bindrum, brings this suit against Defendants, American Home Assurance Co., Inc., American International Group, Inc., AIG Specialty Claims Services, Inc., and CHARTIS Insurance Co., (collectively, "Defendants"), alleging various state law causes of action arising out of Plaintiff's claim for workers' compensation benefits.

The matter initially came before the court on September 28, 2010 for oral argument on Defendants' Rule 12(b)(6) motion to dismiss. On October 6, 2010, the court *sua sponte* ordered Plaintiff to address whether this court has subject matter jurisdiction over this action. In particular, the court questioned whether the $75,000 amount in controversy requirement of 28 U.S.C. § 1332(a) was satisfied. Plaintiff filed an affidavit in response on October 26, 2010, and Defendants responded to his affidavit on November 23, 2010, arguing that the court lacks subject matter jurisdiction over this action. For the reasons set forth below, the court concludes that Plaintiff has failed to establish subject matter jurisdiction, and his Complaint is therefore dismissed without prejudice. Defendants' pending motion to dismiss is denied as moot.

Plaintiff is represented by Christopher J. McVeigh, Esq., and Defendants are represented by Mark F. Werle, Esq.

I. Background.

A. The Complaint's Allegations.

On April 30, 2003, Plaintiff was injured in the course of his employment while working for the Brookhaven School for Boys in Chelsea, Vermont. (Doc. 1, Compl. ¶ 8.) Plaintiff sought coverage from Brookhaven's workers' compensation insurer, which, collectively, constitute the Defendants in this case. *Id.* ¶ 9. In June 2008, the parties agreed to settle Plaintiff's claim using Vermont Department of Labor ("DOL") "Form 15," *id.* ¶ 13, for an "overall" settlement amount of $225,000 in addition to a Medicare Set-aside ("MSA") funded by Defendants up to a total amount of $750,000. *Id.* ¶ 21; ex. 1 at 3 ¶ 1. Although Plaintiff and Defendants signed the settlement agreement as of August 6, 2008, a settlement under Form 15 is not final until approved by the DOL's Commissioner. *Id.* ex. 1 at 2; *see also* 21 V.S.A. § 662(a).

As part of the "Form 15 Settlement Agreement" (the "Agreement"), Defendants assumed responsibility for preparing an MSA proposal for submission to the Center for Medicare and Medicaid Services ("CMS"), the federal agency within the United States Department of Health and Human Services that administers the Medicare program. *Id.* ¶ 14. The MSA proposal is a document through which the petitioner—in this case the insurer-Defendants—seeks approval from CMS to set aside a sum certain to protect Medicare's interests in a workers' compensation claim. The MSA is used to pay for medical services that would otherwise be reimbursable by Medicare, and once the account is depleted, "Medicare will pay for any Medicare-covered medical treatment . . . received as a result of the injury sustained at work." *Id.* ¶¶ 15, 20; ex. 1 at 14. Defendants selected the vendor Nuquest Bridge Pointe ("Nuquest") to prepare the MSA on its behalf, and agreed it would be prepared and submitted "as soon as practicable after [Plaintiff] has agreed to and signed both the modified Form 15 and Addendum and [Defendants have] received the documents and [Plaintiff] has submitted up to date

medical reports[.]" *Id.* ¶ 18; ex. 1 at 3 ¶ 5. The parties agreed that the settlement paperwork would not be submitted for final DOL approval until after CMS approved the MSA. *Id.* ¶ 22; ex. 1 at 3 ¶ 6.

Defendants also agreed to advance $7,000 per month to Plaintiff out of the total settlement amount until their Agreement became operative upon DOL approval. These monthly advances started in August 2008 after both parties signed the settlement paperwork. *Id.* ¶ 20. In light of his documented medical needs, Plaintiff alleges that Defendants knew or should have known that the monthly advances would necessarily be used for Plaintiff's medical expenses. *Id.* ¶ 24.

As of late September 2008, Defendants had not yet provided copies of Plaintiff's medical records to Nuquest, thereby delaying Nuquest's preparation and submission of the MSA proposal to CMS. *Id.* ¶¶ 25-26. Following the one-month delay, Nuquest submitted a proposal on October 30, 2008 seeking approval from CMS to set aside $223,693 for future medical services and prescription drug treatment related to Plaintiff's work injury. (Doc. 14-1 at 9.) In a letter dated December 8, 2010, CMS stated that it did not accept Nuquest's proposal, and had instead determined that a total MSA of $282,179 would adequately protect Medicare's interests. *Id.* On March 11, 2009, Plaintiff signed a "First Supplemental Addendum to Modified Form 15 Settlement Agreement," agreeing to incorporate into the Agreement the precise value of the MSA as determined by CMS. (Doc. 14-1 at 7.)

After CMS approved the MSA on December 8, 2008, Defendants did not submit the completed Agreement to the DOL for its review and approval until March 18, 2009. The DOL approved the Agreement that same day. (Doc. 1 ¶¶ 30-33.) According to Plaintiff, each month's delay between August 2008 and March 2009 further depleted his residual settlement amount by $7,000, and forced him to use part of each $7,000 monthly advance payment for medical costs that would have otherwise been covered by MSA funds. *Id.* ¶ 32. He also alleges that he suffered damages because Nuquest submitted an

undervalued MSA proposal that did "not adequately or fairly address [Plaintiff's] anticipated future medical needs for his work-related injury." *Id.* ¶ 18.

Invoking this court's diversity jurisdiction under 28 U.S.C. § 1332, Plaintiff filed the Complaint on May 14, 2010, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and bad faith. He seeks compensatory and punitive damages as well as attorney's fees. (Doc. 1 ¶¶ 6-7, 35-59.)

## II.    Legal Analysis.

Given the procedural posture of this case, the court first considers, as it must, whether it has jurisdiction to reach the merits of Defendants' motion to dismiss. "'It is a fundamental precept that federal courts are courts of limited jurisdiction' and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) (quoting *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978)). "If subject matter jurisdiction is lacking and no party has called the matter to the court's attention, the court has the duty to dismiss the action [*sua sponte*]." *Id.* at 62-63; *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Plaintiff invokes the court's diversity jurisdiction under 28 U.S.C. § 1332(a), which states that the federal "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . citizens of different States[.]" 28 U.S.C. § 1332(a)(1). As the party asserting subject matter jurisdiction, Plaintiff has "the burden of proving that it appears to a 'reasonable probability' that [his] claim is in excess of" $75,000. *Tongkook America, Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994) (quoting *Moore v. Betit*, 511 F.2d 1004, 1006 (2d Cir. 1975)). "This burden is hardly onerous, however, for [the Second Circuit] recognize[s] 'a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy.'" *Scherer v. Equitable Life Assurance Society of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) (quoting *Wolde-Meskel v.*

4

*Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999)). For this presumption to be overcome, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount[.]" *Tongkook*, 14 F.3d at 784. The court may rely on affidavits and other evidence to determine the amount in controversy. *See United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 305 (2d Cir. 1994).

In addition to his demands for punitive damages and attorney's fees, Plaintiff claims that he has suffered actual damages in two separate ways. First, he claims that Defendants did not accurately assess his future medical expenses when they prepared the MSA proposal, thereby undervaluing his MSA. Second, he contends that Defendants' delay in finalizing the Agreement caused him to use the monthly advance payments of $7,000 to cover his medical expenses that otherwise would have been reimbursed out of the MSA.

### A. Plaintiff Cannot Recover Damages Based on Defendants' MSA Proposal.

In support of his claim that the amount in controversy exceeds $75,000, Plaintiff has submitted an affidavit from counsel averring that: (1) counsel had obtained an independent MSA estimate from "Hummel Consultation Services" that valued Plaintiff's future anticipated medical needs at $2,383,564.72; and (2) Defendants' MSA proposal requested approval to set-aside only $200,820, exclusive of future prescription drug expenses. (Doc. 22 at 1.) Thus, Plaintiff apparently asserts that his actual damages are the difference between Defendants' MSA proposal and what, in Plaintiff's estimation, the MSA proposal should have been, a sum well in excess of the $75,000 threshold. However, Plaintiff does not allege that he is entitled to recover this difference; rather, his Complaint acknowledges that an undervalued MSA poses no economic risk to Plaintiff because "Medicare would cover [Plaintiff's] medical costs" once the "allocation for the MSA was exhausted." (Doc. 1 ¶ 20.) And in correspondence sent to Plaintiff and his counsel which Plaintiff attached to his Complaint, CMS confirmed that "when all [MSA] funds . . . have been depleted . . . Medicare will pay for services that are related to the

work injury or disease[.]" (Doc. 1-2 at 12); *see also* Kenneth Paradis, *New Requirements for Medicare Set Aside Arrangements*, 18 J. WORKERS COMP. 31, 35 (Winter 2009) (explaining that preapproval by CMS of an MSA "guarantees that Medicare will be available as a payer in the event that the MSA is appropriately exhausted."). Accordingly, even if Defendants breached a contractual duty by undervaluing the MSA proposal, that breach cannot result in any recovery for Plaintiff because Plaintiff concedes that only Medicare (and not Plaintiff) will be harmed by the alleged breach. (Doc. 1 ¶¶ 15, 20); *see* Restatement (Second) of Contracts § 346 (1981) (explaining that compensatory damages will not be awarded in the absence of harm or loss caused by the breach); 24 Richard A. Lord, *Williston on Contracts* § 64:8 (4th ed. 2010) (noting that a "party cannot recover more [than nominal damages] without establishing a basis for an inference of fact that he or she has been actually damaged."); *see also R.R. Donnelley & Sons Co. v. Vanguard Transp. Sys., Inc.*, 641 F. Supp. 2d 707, 726 (N.D. Ill. 2009) (explaining that a breach of contract causing no harm "precludes an award of anything but nominal damages.").

    Furthermore, Plaintiff challenges only the MSA proposal prepared by Defendants, but the record is clear that CMS did not approve that proposal, and instead made its own determination as to the value of Plaintiff's future medical treatment and prescription drug costs. *See* Doc. 14-1 at 9 (letter from CMS explaining that Nuquest had proposed an MSA with a total value of $223,693, but that CMS had determined that $282,179.00 adequately considers Medicare's interests). It was thus CMS's valuation that was actually incorporated into the Agreement when Plaintiff signed the "First Supplemental Addendum to Modified Form 15 Settlement Agreement." *Id.* at 7. Plaintiff has not offered any allegations or legal theory to explain how he has suffered harm as a result of an MSA proposal that was never approved and to which he has never been subject.

    Finally, Plaintiff has failed to explain how he did not waive any claim that the MSA is inadequately funded when he agreed to the CMS-approved allocation by signing the "First Supplemental Addendum to Modified Form 15 Settlement Agreement." (Doc.

14-1); *see Whippie v. O'Connor*, 2010 VT 32, ¶ 30, 996 A.2d 1154, 1165 (2010) (finding that "defendant's claim for a different allocation has . . . been waived" because "the parties agreed to a specific split of the mediation fee below").[1] Plaintiff does not allege that the Agreement and its addenda are invalid; to the contrary, the gravamen of his Complaint is that the Agreement was enforceable and breached by Defendants even before the DOL approved it. *See* Doc. 1 ¶ 36 ("Once they agreed to the terms of the settlement . . . Defendants had a fiduciary and good faith obligation to reasonably comply with the terms of that agreement.").

### B. Plaintiff Does Not Allege Damages Caused by Defendants' Delay In Excess of $75,000.

Plaintiff alleges that Defendants' delay in securing DOL approval of the Agreement caused Plaintiff to use unspecified portions of his lump sum settlement to pay for medical expenses that would have otherwise been paid out of the MSA. Specifically, Plaintiff alleges that he used portions of the monthly $7,000 advance payments out of his $225,000 total settlement to pay for medical services between August 6, 2008 (the day he signed the Agreement) and March 18, 2009 (the day the DOL finalized the settlement and Plaintiff gained access to the MSA). Neither Plaintiff's Complaint nor his counsel's affidavit set forth the amount of each advance payment Plaintiff spent on otherwise reimbursable medical expenses. Assuming that Plaintiff was forced to spend the entirety of every advance payment, and assuming further that he could recover such expenses for the entire seven month period between the Agreement's signing and its final approval, Plaintiff has established approximately $49,000 in actual damages, well below the amount in controversy threshold.

---

[1] Because this suit is brought under this court's diversity jurisdiction, the substantive law of Vermont governs Plaintiff's claims. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005).

### C. Plaintiff's Claims for Punitive Damages and Attorney's Fees Do Not Count Toward the Jurisdictional Amount.

Punitive damages may be included in the jurisdictional calculation when they are permitted by the controlling substantive law, *see A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991), and attorney's fees may be included only where they are recoverable as of right. *See Rescuecom Corp. v. Chumley*, 522 F. Supp. 2d 429, 437-38 (N.D.N.Y. 2007). Claims for punitive damages as a basis for the jurisdictional amount are subject to closer scrutiny than claims for actual damages. *See Zahn v. Int'l Paper Co.*, 469 F.2d 1033, 1034 n.1 (2d Cir. 1972).

Under Vermont law, punitive damages may be obtained from a corporation only if the plaintiff can prove a malicious act committed by "the governing officers of the corporation or one lawfully exercising their authority, or, if the act . . . is that of a servant or agent of the corporation, it must be clearly shown that the governing officers either directed the act, participated in it, or subsequently ratified it." *Shortle v. Central Vermont Public Serv. Corp.*, 137 Vt. 32, 33, 399 A.2d 517, 518 (1979).

Each defendant in this case is a corporation, however, Plaintiff's Complaint does not allege that any of Defendants' governing officers either engaged in, directed, or subsequently ratified any of the conduct of which Plaintiff complains. Therefore, although Plaintiff's Complaint contains generic references to "actual malice," and "malicious intent," *see* Doc. 1 ¶ 42, he has not alleged a claim for punitive damages under Vermont law, and punitive damages may not be counted towards satisfaction of the jurisdictional amount. *See, e.g., Jiminez v. Going Forward, Inc.*, 25 F. Supp. 2d 54, 55 (D. Conn. 1998) (refusing to consider punitive damages as part of the jurisdictional amount because the court had "serious doubts" as to whether plaintiff had sufficiently alleged that "defendant's conduct was intentional and wanton, malicious, violent or motivated by evil" as required by Connecticut law).

Finally, Plaintiff has not demonstrated that attorney's fees are available to him as a matter of right. Vermont adheres to the American Rule, "under which parties must bear their own attorney['s] fees absent statutory or contractual exception[.]" *Windsor School*

*Gen. Mut. Ins. Co. v. Woods*, 2003 VT 33, ¶ 18, 175 Vt. 212, 824 A.2d 572 (2003)). Plaintiff's claims are common law causes of action, and he points to no statute or contractual provision that would entitle him to recover attorney's fees. Accordingly, his request for attorney's fees cannot be considered as part of the amount in controversy.

### III. Conclusion.

Because Plaintiff alleges that Medicare will be liable for his work-related medical expenses that exceed the MSA allotment, the difference between Plaintiff's and Defendants' MSA valuation has no bearing on the actual damages alleged in Plaintiff's Complaint. In addition, because any damages caused by Defendants' delay amount to, at most, approximately $49,000, it is legally certain that Plaintiff cannot recover actual damages that exceed the requisite jurisdictional amount of $75,000. The court thus lacks subject matter jurisdiction over this action, and Plaintiff's Complaint is hereby DISMISSED WITHOUT PREJUDICE. Defendants' motion to dismiss (Doc. 5) is DENIED as moot.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 4th day of February, 2011.

Christina Reiss, Chief Judge
United States District Court